P24RSKA1

1  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK
2  ------------------------------x

3  IN RE CUSTOMS AND TAX
   ADMINISTRATION OF THE KINGDOM
4  OF DENMARK
   (SKATTEFORVALTNINGEN) TAX
5  REFUND SCHEME LITIGATION
                                        18 MD 2865 (LAK)
6  ------------------------------x
                                        Trial
7
                                        New York, N.Y.
8                                       February 4, 2025
                                        2:00 p.m.
9  Before:

10                   HON. LEWIS A. KAPLAN,

11                                         District Judge
                                          -and a Jury-
12
                         APPEARANCES
13
   HUGHES HUBBARD & REED LLP
14      Attorneys for Plaintiff SKAT
   BY:  MARC A. WEINSTEIN
15       WILLIAM MAGUIRE
         NEIL OXFORD
16       JOHN McGOEY
         GREGORY FARRELL
17
   KOSTELANETZ LLP
18      Attorneys for Defendants Azalea Pension Plan, et al
   BY:  SHARON McCARTHY
19       DANIEL C. DAVIDSON
         MAXWELL BROWN
20
   WILMER CUTLER PICKERING HALE AND DORR LLP
21      Attorneys for Defendants Avanix Management LLC, et al
   BY:  PETER NEIMAN
22       ANDREW S. DULBERG
         BRITTANY R. WARREN
23
   Also Present:  Camilla Laursen
24                 Kelby Ballena - tech
                   John Christopher - tech
25

P24RSKA1

```
 1              (Trial resumed; jury not present)

 2              THE COURT:  Good afternoon.  I hope everybody got some

 3    sleep this weekend.  You should have the circulation drafts of

 4    the verdict form and the proposed charge, and we'll mark the

 5    verdict form draft as Court Exhibit 1 and the circulated draft

 6    of the charge as Court Exhibit 2.  And we'll start with the

 7    verdict form, which is usually uncontroversial, but I have a

 8    feeling that may not be true today.

 9              Let's take it by groups of pages.  Any objections on

10    pages 2 through 7?

11              MR. BROWN:  Yes, your Honor.  This is Maxwell Brown

12    for the van Merkensteijn defendants.  We object to the

13    inclusion of part B to these questions with the by the

14    preponderance of the evidence standard.

15              THE COURT:  Sorry.  You object to what?

16              MR. BROWN:  To including a preponderance of the

17    evidence standard on the jury form and jury instructions for

18    the fraud aiding and abetting fraud claims.

19              THE COURT:  Overruled.  It's perfectly obvious why

20    it's there, and it's perfectly appropriate for it to be there.

21    There's no reason to try this case twice because of something

22    the jury could determine now, and give an appellate court, who

23    has a different view on the question of what the standard of

24    proof is, the opportunity to enter a correct judgment no matter

25    which way it goes.
```

P24RSKA1

1              MR. BROWN:  I thought that might be your position,

2    your Honor, if I could just say a couple of other points,

3    however?  At this stage, we submit that it is prejudicial for

4    us to prepare our summations when we cannot clearly address the

5    one burden of proof that we think applies, which is a clear and

6    convincing standard under New York law.  We also submit that if

7    this instruction is given to the jury, it could be confusing

8    and misleading in their deliberations, and gives rise to the

9    risk of a kind of compromised verdict in which the jury says no

10   on clear and convincing evidence and yes on the preponderance,

11   not because this is the true view of the evidence but because

12   this is their way of compromising given competing standards.

13              THE COURT:  I hear you.  Mr. Weinstein, do you have a

14   view?

15              MR. WEINSTEIN:  No, your Honor.

16              THE COURT:  Overruled.  Anything else?

17              MR. FARRELL:  Just one other point, your Honor.

18   Gregory Farrell, Hughes Hubbard, for plaintiff, SKAT.  On the

19   proposed verdict --

20              THE COURT:  You lost me there.

21              MR. FARRELL:  I'm sorry.  In the individual defendants

22   and associated plans section, we had similar questions for the

23   plans themselves that are defendants if this case, and we noted

24   that your Honor took those out.  And our understanding is that

25   that may be because if the jury were to answer yes for all

P24RSKA1

1    these questions, say, for instance, for Mr. Markowitz --

2              THE COURT:  You lost me again.  If the jury were to?

3              MR. FARRELL:  To answer yes for all these questions,

4    say, for instance, for Mr. Markowitz, that that would be a

5    sufficient basis for a judgment against the plan, too.  But we

6    just wanted to note that and ask your Honor if that was a

7    correct understanding.

8              THE COURT:  That's my understanding.

9              MR. FARRELL:  Thank you, your Honor.

10             MR. DULBERG:  Your Honor, Drew Dulberg.  We have a

11   separate issue, which is we would ask the Court to add a

12   damages question on the fraud, aiding abetting fraud, negligent

13   misrepresentation claims.  And I know the Court has previously

14   suggested that there's dispute as to the amounts the plans

15   received.  That is true, but we think a jury could easily find

16   that not every reclaim submission was the product of fraud.

17   That is to say, over time there were red flags that emerged.

18   Perhaps it was the case that certain of the reclaim submissions

19   were negligently made and certainly were the product of fraud.

20   And so, the jury should be asked to assign how much damages, if

21   any, it finds as a result of any finding of an intentional

22   misstatement to SKAT.

23             THE COURT:  I'm not sure I really understand what you

24   said.

25             MR. DULBERG:  For example, your Honor, SKAT has argued

P24RSKA1

1    that there are a number of red flags that arose late in time.

2    In 2014, they're getting odd lots of shares.  They're using

3    four custodians instead of one.  The jury could reasonably

4    conclude -- or one thing the jury might conclude is that in

5    2012 the defendants did not have fraudulent intent; they had

6    done due diligence, et cetera.  Over time, SKAT has argued more

7    red flags emerged, and so the jury may find that by 2015, they

8    knew, or were reckless in not knowing, that the reclaims were

9    fraudulent, which is different than what we have here which is

10   the suggestion that they are locked into finding, or are not

11   given the option of a --

12            THE COURT:  Be specific about a question.

13            MR. DULBERG:  A question would be --

14            THE COURT:  They all have numbers.  What question are

15   you talking about?

16            MR. DULBERG:  Well, the absence of a question between

17   three and four.  So after question three:  Did SKAT prove that

18   Richard Markowitz knew at the time the statements were

19   made——which again there are statements made over a period of

20   three years——that the statements were false, or did he act

21   recklessly with regard to whether they were true or false?  If

22   you answer that question yes, what damages, if any, do you

23   find?  In what dollar amount do you find that SKAT was

24   defrauded?  And the answer -- it is hardly inevitable that the

25   answer will be the full amount that everyone has agreed the

P24RSKA1

1    plans received.

2              THE COURT:  Mr. Weinstein, how do you react to that?

3              MR. FARRELL:  Your Honor, we don't think it's

4    necessary, but we wouldn't object to the question that asked a

5    jury for the damages amount.

6              THE COURT:  And what then happens if the jury comes up

7    with a number that can't rationally be reconciled with any view

8    of the evidence?

9              MR. FARRELL:  Your Honor, I think that's a fair point.

10    I think Mr. Dulberg's point maybe goes more to reasonable

11    reliance than to the amount of the damages itself.

12              MR. DULBERG:  No.  It goes to the defendant's mental

13    state.  The jury could find that they began with a not even

14    negligent mental state but that as facts emerged and the

15    trading increases and they have more and more plans, SKAT has

16    made this argument very clearly that over time there are, as

17    they say, badges of fraud.  We didn't see Martin Smith's

18    signature on ten GMSLAs until 2014 so it's a very different --

19              THE COURT:  You don't think there's ten different

20    Martin Smiths?

21              MR. DULBERG:  No, I think -- we concede there is only

22    one who signed all of those documents, but that's not a red

23    flag that was visible to anyone in 2012 or 2013 or the start of

24    2014.  So we think the jury would assign a number that is less

25    than the $38 million number we've seen so much of, and they

P24RSKA1

1    should have that opportunity.  Unless, given the alternative --

2              THE COURT:  I understand your point, but I think you

3    are going at it from the wrong end.  A better approach to the

4    problem, if it's really a problem, is with respect to time

5    periods.  Because there's no doubt that if there was fraudulent

6    intent in March of 2014, the damages are what was paid while

7    that intent existed.  And so, saying to the jury, well, pick a

8    number, any number, and not tying it back to the intent at the

9    time doesn't make sense to me.

10             MR. DULBERG:  Well, so, your Honor, first of all, they

11    do have the charts that have the date of any reclaim

12    submissions to SKAT.  But to address your Honor's concern, I

13    think you could simply ask:  At what point did SKAT prove that

14    Richard Markowitz knew or acted recklessly with regard to the

15    truth or falsity of the reclaim statements?  One possibility

16    would be some day in 2012, some day in 2013, some day in 2014,

17    2015 or never, but you could ask them to put a date on it.  And

18    then, I still think it's up to the jury to figure out how much

19    damages are tied to that state of mind.

20             THE COURT:  That's what I suggest to you makes no

21    sense at all.  Because if you have a date as of which there was

22    fraudulent intent, the damages are the reclaims.

23             MR. DULBERG:  Submitted from that date forward?

24             THE COURT:  Yes.

25             MR. DULBERG:  Right.  But who is going to figure it

P24RSKA1

1    out?

2                THE COURT:  It's not disputed, is it?  We have the

3    date of every reclaim payment in evidence.  Nobody has disputed

4    any of them.

5                MR. DULBERG:  We have the date on which SKAT paid

6    reclaims tied to a chart that is in kroner, and there's a

7    different chart that exists that doesn't have the dates on it.

8                THE COURT:  We all know how to convert kroner to

9    dollars.

10               MR. DULBERG:  We do.

11               THE COURT:  Do you want to leave that to the jury?

12   Are you going to provide the mainframe computer for them and

13   the IT staff?

14               MR. DULBERG:  SKAT has the burden of proving damages

15   here.  What we can't have is a scenario where they have

16   open-endedly that at some point unknowable point in time the

17   defendants knew or should have known.

18               THE COURT:  Look, I understand the logic of that

19   argument.  I do.  Your proposed solution is not rational in my

20   view.

21               MR. DULBERG:  But what about the proposed solution of

22   asking them to identify a date on which the defendant had the

23   requisite intent?  I think that's necessary.

24               THE COURT:  Mr. Weinstein?

25               MR. WEINSTEIN:  Yes.  I think that's an adequate

P24RSKA1

1    solution, which is that, I guess in connection with whether

2    there's fraud or negligence, I think the first question would

3    be whether -- or if they find that the defendant -- the

4    relevant state of mind existed at a time other than whatever

5    the first relevant date is, then they should pick what date it

6    did exist.

7            Then with respect to damages, to the extent I think

8    this is where your Honor is going, we would agree that that

9    just follows from it.  And those are things that would be

10   worked out with the Court afterwards.

11           THE COURT:  All right.  So the way this would work is

12   to reframe question three to ask in substance whether SKAT

13   proved that Markowitz knew at the time the first statement was

14   made that the statements were false.  And then insert something

15   to the effect:  Did SKAT prove that he subsequently knew, and

16   if so, what was the earliest date when that knowledge existed?

17   That solves the problem, right.

18           MR. DULBERG:  Yes, something to that effect would,

19   your Honor.

20           THE COURT:  Just a minute.  Does that fix need be made

21   to anything else?

22           MR. DULBERG:  Yes, we think it needs to recur with

23   section four, aiding and abetting, and six, negligent

24   misrepresentation.  It's the same issue.

25           THE COURT:  I think I agree with you on four.  Six, I

P24RSKA1

1   would suggest that the answer is a little different.  It would

2   be a question to the effect of when did his behavior first

3   start being negative, words to that effect.

4           MR. DULBERG:  If at all, yes.

5           THE COURT:  Well, they would first have answered six.

6           MR. DULBERG:  Oh, yes.  Yes, your Honor.

7           THE COURT:  I think that works.  Okay.  That takes

8   care of that.

9           Anything else in the first seven pages?

10          MR. WEINSTEIN:  May I ask on those, that series of

11  questions that your Honor is going to include, essentially they

12  are still going to answer the first question?

13          THE COURT:  The first question being number one?

14          MR. WEINSTEIN:  I'm sorry, no.  With respect to

15  whether it's fraud, aiding or abetting, or negligence, whether

16  SKAT proved by the relevant standard.  Maybe it's easier --

17          THE COURT:  It would be helpful if you were more

18  explicit.

19          MR. WEINSTEIN:  Yes, I realize that.  Would your Honor

20  just be able to read back what you think you're going to

21  include now?

22          THE COURT:  I said that the way this would work would

23  be to reframe question three to ask in substance whether SKAT

24  proved that Markowitz knew at the time the first statement was

25  made, that means first reclaim, that the statements were false.

P24RSKA1

1   And then, insert something to the effect:  Did he subsequently

2   have that knowledge?

3           MR. WEINSTEIN:  If the answer is no.

4           THE COURT:  If the answer is no, did he subsequently

5   have that knowledge?  And if so, when did that first occur?

6           MR. WEINSTEIN:  Yes.  And it would be the same concept

7   for the next two claims.

8           THE COURT:  Well, same concept with respect to

9   question four.  And then we were looking at the negligent

10  misrepresentation and something along those lines that would be

11  worded differently.

12          MR. WEINSTEIN:  Right.  Did he know at the first

13  instance or did he have the right state of mind at the first

14  instance?  If not, did he subsequently and then when?

15          THE COURT:  We'll ask whether he failed to use

16  reasonable care to ensure that the statements in the first

17  reclaim application listed in Chart A was filed.  Yes or no?

18  And if no, did SKAT prove that he subsequently acted

19  negligently, and if so, when was the first date that he did so?

20          MR. WEINSTEIN:  Yes, okay.  Thank you.

21          MR. DULBERG:  Thank you, your Honor.  We have one

22  very, very minor question or suggestion for the Court within

23  these pages.  On page 3 of Court Exhibit 1, the formulation,

24  yes as to none, we think is confusing, and the word no, which

25  the Court uses seemingly every other time, would be more clear

P24RSKA1

1   to the jury.

2           THE COURT:  You know, if somebody had suggested that

3   when we started this process, I would have done it.  Having

4   spent the last four days trying to make this all make sense and

5   be logically consistent and have the language used in the

6   charge fit with the questions on the verdict form, I'm not

7   going to make the change because I fear that something will get

8   lost and confused in the translation.  I think it's clear

9   enough.

10          MR. DULBERG:  Okay.

11          THE COURT:  Okay.  So we go to let's say pages 8 to

12  14.  And obviously the changes that are made in the section on

13  Markowitz will also be made in the corresponding questions

14  about the other defendants.

15          MR. WEINSTEIN:  I think the only comment we have on

16  those pages is to the charts.  So chart B on page 10 --

17          THE COURT:  Yes.

18          MR. WEINSTEIN:  -- at the top, the plans of which

19  Mr. van Merkensteijn was a beneficiary, should include similar

20  to Mr. Markowitz the Michelle, Remece, and Xiphias plans

21  because they were both beneficiaries in those plans.

22          THE COURT:  Okay.  So you want the chart -- sorry.

23  I'm confused.

24          MR. WEINSTEIN:  The top chart of the plans to which

25  Mr. van Merkensteijn was a beneficiary --

P24RSKA1

1          THE COURT:  Right.

2          MR. WEINSTEIN:  -- that should include the three

3     plans, Michelle, Remece, and Xiphias, which at the moment are

4     in the friends and family at the bottom.

5          THE COURT:  All right.  And Xiphias.  That's easy.

6          MR. WEINSTEIN:  And then, Monomer, which is at the

7     moment listed in the top half, should be listed in the friends

8     and family section of that chart.

9          THE COURT:  Everybody agree on that?

10         MR. BROWN:  Yes, your Honor.

11         THE COURT:  Okay.

12         MR. WEINSTEIN:  And then, that would be the same for

13    the chart on 13.  So we would include in that chart Michelle,

14    Remece, and Xiphias, and we would take out Monomer.

15         THE COURT:  Okay.  Page 14 to the end?

16         MR. BROWN:  Your Honor, we had an issue to raise

17    regarding the statute of limitations section in part three.

18         THE COURT:  Yes.

19         MR. BROWN:  We would submit there should be an

20    additional question for unjust enrichment, separate from the

21    question for the other claims, because of the difference in

22    mental state; that is, the jury could find that depending on

23    the defendants' mental state that SKAT should have known of its

24    different claims at different times.

25         THE COURT:  I'm sorry.  You've confused me.

P24RSKA1

1        MR. BROWN:  That is, it's possible that the jury could

2   find that by January 1, 2015, SKAT should not have known of,

3   for example, it's fraud claims, because it would not have known

4   about the intent and mental state of the defendants.  However,

5   because that's not an element of the unjust enrichment claim,

6   it could be that the jury could reasonably find that SKAT

7   should have known of its unjust enrichment claims sooner than

8   it would have known of its other claims.

9        MR. WEINSTEIN:  I don't think it's necessary, but we

10  don't have a strong objection or position one way or the other.

11       THE COURT:  Try me once more.  I'm trying to

12  understand it.

13       MR. BROWN:  So although the statute of limitations for

14  all of the claims at issue is three years, it could be that

15  SKAT knew or should have known of different categories of

16  different claims at different times.  That's what the jury

17  could find.  And it could be that the jury would find that,

18  yes, SKAT's claims for unjust enrichment are time barred while

19  it might find that SKAT's claims in other categories are not

20  time barred.  And the difference is the mental state and the

21  intent that goes into these different claims.

22       MR. NEIMAN:  Judge, if I could just give an example of

23  that to make this practical?  Suppose that the jury concludes

24  that SKAT should have known that the reclaims were false and

25  that we got the money, but not -- but that SKAT should not have

P24RSKA1

1    had the evidence that we acted with fraudulent intent at that

2    time.  That would mean that the unjust enrichment claim would

3    be time barred, and the fraud claim not time barred, for

4    example.  All you need to fix this is just another question

5    that simply breaks out the two categories.

6         THE COURT:  We'll call it a hypothetical question

7    38(a).  You would change 38 to read:  All of its then available

8    claims against the defendant except unjust enrichment --

9         MR. NEIMAN:  Yes.

10        THE COURT:  -- and then ask a separate question for

11   unjust enrichment.

12        MR. NEIMAN:  Yes, your Honor.  I think that would

13   accomplish what we're trying to accomplish here.

14        THE COURT:  I'll do that.

15        MR. WEINSTEIN:  We were going to raise one other

16   question with respect to this, your Honor, before you put pen

17   to paper there.  There's the claims for when they were

18   beneficiary of their own plans, and then there's claims when

19   they were just in a partnership with respect to the friends and

20   family plans.  This came up the other day because the defense

21   wanted a statute of limitations question on the February—not

22   February—November 2019 complaint.

23        THE COURT:  Which is not here.

24        MR. WEINSTEIN:  Right.  Embedded within this question

25   is the same thing, so there's zero basis for the jury to find

P24RSKA1

1      that with respect to when they were in a partnership with

2      someone else's plan, that SKAT should have known by January 1,

3      2015.  There's just -- there's no way to have found that

4      information other than by litigation and getting the

5      information that they were in partnerships.

6              So we would propose that this question be limited to

7      not all of its then available claims, but all of its claims

8      against the defendant for a plan in which it was -- that's not

9      a good wording.  For the plans where it was the beneficiary,

10     not for the partnership plans.

11             MR. BROWN:  Your Honor, if I may speak on that as

12     well?  Because we also believe there's a difference between the

13     November 2019 complaint that SKAT filed, and the ones it filed

14     earlier.  In short, SKAT had more time to conduct its

15     investigation to bring its claims with the later complaint.

16     And so, the start date of the limitations period would be

17     different.  And so, we would propose adding an additional

18     question regarding the reclaims at issue in the November 2016

19     complaint -- sorry, November 2019 complaint.  And so, instead

20     of SKAT knew or should have known before January 1, 2015, as to

21     those other reclaims, the start date would be in November 2016.

22             MR. WEINSTEIN:  That's what we argued the other day,

23     and your Honor ruled against them on that.  What is the basis

24     for the jury to find that--

25             THE COURT:  I have a simple question which is not

P24RSKA1

1    wholly rhetorical.  Does anybody want to have any verdict at

2    all this year, or is the goal here to make this so complicated

3    that the jury in effect goes on strike?

4              MR. DULBERG:  We don't want the jury to go on strike.

5    The November 2019 complaint against Mr. Markowitz alone

6    asserted $120 million in damage.  It's a massive complaint.

7    Those defendants in that complaint are all partnerships.  And

8    so, the issue that Mr. Weinstein just raised is very closely

9    related to the issue Mr. Brown just raised.  In the sense that

10   as to that complaint, we are seeking a third question, and

11   understand the Court may already have a view on it.  But it's a

12   November 2019 complaint.  You go back three years and ask if

13   the claims that were presented in that complaint SKAT knew or

14   should have known of them by November 11, 2016.

15             THE COURT:  Look, this effort to suddenly spring what

16   amounts to a limitations defense I believe after the plaintiff

17   rested in this case, and, in any case, provoked by the fact

18   that you lost your tolling agreement defense, is unfair and

19   it's out of time.  It is one thing to plead in totally

20   conclusory terms, the complaint is barred in whole or in part

21   by the statute of limitations within the 21 days one has to

22   answer a complaint before you have any discovery, before you

23   have any idea what's going on in the case.  It is another thing

24   in the middle or toward the end of the trial to pop a new one,

25   that was never raised before out of left field, particularly as

P24RSKA1

1    late as you are trying to do it.

2            The court of appeals indicates——although not in a case

3    on all fours——that the difference between the conclusory

4    assertion of the statute of limitations in an answer and

5    sticking with a conclusionary assertion by this time in the

6    litigation matters a great deal.  And the case that you might

7    want to look at is *GEOMC v. Calmare*, 918 F.3d 92.  I'm just not

8    going to insert it.

9            If you think, in the event of a verdict that you're

10   unhappy with, that there was something you asked for in the

11   verdict sheet that I'm not going to give you, and this is one

12   of them, if it were omitted on consent, I would be obliged to

13   make findings and enter judgment under Rule 49 and would do so.

14   Given the circumstances in which this is raised, I think it's

15   in everybody's interest to agree that we're not going to put

16   this in, and take your best shot post verdict.

17           MR. DULBERG:  Your Honor, our view is we disclosed the

18   statute of limitations defense specific to this complaint.

19           THE COURT:  Pardon?

20           MR. DULBERG:  The defendants included in the proposed

21   verdict form and proposed jury instructions that we submitted

22   before trial a specific argument that the November 29 complaint

23   was untimely based on the theory that the Court has rejected

24   based on a tolling agreement that said essentially all claims

25   need to be filed within 60 days of the expiration date.

P24RSKA1

```
 1              THE COURT:  And you did not in either place make the
 2   argument that you're now trying to make.
 3              MR. DULBERG:  Correct, but only after the Court ruled
 4   on this argument did it make available this argument which
 5   is --
 6              THE COURT:  That ruling did not make this available.
 7   That was always available as an alternative to the ruling I
 8   made, to the grounds you relied on that I rejected.  And
 9   furthermore, if you go back to the record in this case, it was
10   crystal clear from the summary judgment decisions that that
11   tolling agreement theory, to whatever extent it was hanging on,
12   was on a ventilator and an artificial heart.  And it was not
13   thrown out then only because the plaintiff didn't make a
14   motion.  It was a meritless argument.
15              MR. DULBERG:  Your Honor, I think our objection is
16   noted for the record.  We'd ask the instruction to be included.
17              THE COURT:  You've submitted no such instruction, I
18   believe.
19              MR. DULBERG:  We emailed it to chambers immediately
20   after plaintiff's counsel.
21              THE COURT:  Your proposed jury instructions were due
22   December 14, not in an email to chambers a couple days ago.
23              MR. DULBERG:  Within the proposed jury instructions
24   that were filed in advance of trial, we included a statute of
25   limitations question specific to the November 29 complaint that
```

P24RSKA1

1    was based on --

2                THE COURT:  On the tolling agreement.

3                MR. DULBERG:  On the tolling agreement.

4                THE COURT:  Right.  The answer is no.  You can either

5    preserve the argument or not preserve the argument.

6                Okay.  Anything else on the verdict form from anybody?

7                MR. WEINSTEIN:  Only to the extent -- so that just

8    gets us back to the language of 38, which is consistent, I

9    think, with your Honor's ruling.  We would ask just that that

10   question be narrowed to the claims for which the defendants are

11   the beneficiaries of the plans.

12               THE COURT:  Any problem with that?

13               MR. BROWN:  Yes, your Honor.  We submit that SKAT had

14   the resources and the warning signs it needed well before 2015

15   to be on notice of all of its claims, and we don't see a basis

16   for distinguishing on that ground when SKAT could have found

17   out all of the information it needed much earlier about each

18   defendant, each plan.

19               THE COURT:  I'm not going to do it, Mr. Weinstein.

20   I'm not going to add what you want.  I'm not going to narrow

21   it.

22               MR. WEINSTEIN:  Okay.  I just want to note for the

23   record, they still haven't pointed to a single fact in the

24   trial record that would have put SKAT on notice that they were

25   in partnerships with other people's plans.  There's nothing in

P24RSKA1

1    the record on that.

2            THE COURT:  Look, I assume we'll have an appropriate

3    motion at an appropriate point depending on the verdict.

4            MR. WEINSTEIN:  Okay.

5            THE COURT:  Nothing else on the verdict form?

6            MR. DULBERG:  Your Honor, we have one other issue with

7    which is with the instruction number 42, question number 42,

8    relating to Section 15-108.  We believe that this was drafted

9    at a time when the only relevant parties who had entered into

10   settlement agreements with SKAT were the former Argre partners,

11   which is why the time period was 2012 to 2014 and the plans

12   listed were Argre-era partnership plans.  Given the events that

13   took place on the eve of this trial, we would suggest that all

14   of the plans be added, including the plans with which

15   Mr. Klugman was in a partnership and that his name be added to

16   the list of individuals at the bottom among whom fault might be

17   apportioned under that statute.  And so, the time period should

18   be expanded in the question from 2012 to 2014 to 2012 to 2015.

19   All of the plans should be included, and, as I said,

20   Mr. Klugman would be added to the list.

21           MR. WEINSTEIN:  No objection.  And by the same token,

22   we were going to propose that Mr. Klugman's name be added in

23   question 41 as well.

24           THE COURT:  Any objection to that?

25           MR. DULBERG:  No, your Honor.

P24RSKA1

1          MR. WEINSTEIN:  Just to make this simpler perhaps,

2     your Honor, if the chart is going to include every plan, you

3     probably just don't need a chart.  I think you could just tell

4     them in connection with all the plans.

5          MR. DULBERG:  No objection.

6          THE COURT:  So precisely what do you propose?

7          MR. DULBERG:  Deleting the chart from 42.

8          THE COURT:  Any objection, Mr. Weinstein?

9          MR. WEINSTEIN:  No objection.

10          MR. DULBERG:  And obviously, the reference to the

11     plans listed below would need to omit the words "listed below."

12     And it could say "the trading that took place on behalf of each

13     pension plan between 2012 and 2015."  And I think we could

14     delete the phrase that is bracketed off, and the question would

15     continue simply adding Mr. Klugman's name to the list.

16          THE COURT:  So we're adding Klugman on page 16 at the

17     bottom to 41.  And we're adding him on page 18 at the bottom,

18     and we're getting rid of the chart on page 17.

19          MR. DULBERG:  Yes, your Honor.

20          THE COURT:  Now, with respect to Lhote and Stein,

21     you're telling me there have been settlements.

22          MR. DULBERG:  There have.

23          THE COURT:  Is there any evidence in the record of it?

24          MR. WEINSTEIN:  Of the settlement itself, no.

25          THE COURT:  Of the fact that there is a settlement?

P24RSKA1

1          MR. WEINSTEIN:  I don't believe so.

2          THE COURT:  Is there any evidence in the record of the

3     fact that there's a settlement with Ben-Jacob?

4          MR. DULBERG:  No.  And, your Honor, the instruction

5     related --

6          THE COURT:  And what about Solo and Shah?

7          MR. WEINSTEIN:  Well, there are no settlements with

8     Solo or Shah.  I don't think there's evidence in the record of

9     any settlements whatsoever.

10         THE COURT:  Isn't it the defendants' burden to prove

11    that?

12         MR. NEIMAN:  Your Honor, I think the defendants'

13    burden is to ask for the allocations that are specified.

14    There's no factual dispute between the parties that the

15    settlements occurred, and obviously the amounts of those

16    settlements and the facts of those settlements are not before

17    the jury.  That's an allocation decision that happens after the

18    judgment.

19         THE COURT:  What is the evidence of Stein, Ben-Jacob,

20    or Lhote being a tortfeasor?

21         MR. NEIMAN:  Well, your Honor, there was actually

22    evidence that Stein and Lhote were the principals of North

23    Channel Bank, and there are claims that the submissions by

24    North Channel Bank were fraudulent.  So --

25         THE COURT:  Okay.

P24RSKA1

1          MR. NEIMAN:  There were also -- so that's that one

2     piece.

3          THE COURT:  Okay.  I appreciate that.

4          MR. NEIMAN:  And obviously that came in with regard to

5     the Omineca plan.  And they were also part of the Argre

6     partnership.  And I think it's SKAT's position that just

7     pursuing these deals, you would have no know they were

8     fraudulent, and they pursued them, too.

9          THE COURT:  What about Ben-Jacob?

10         MR. NEIMAN:  Ben-Jacob, obviously the testimony was

11     that Mr. Ben-Jacob actually signed a lot of reclaim

12     applications, and I think SKAT's position when they sued him

13     was that he knew.

14         THE COURT:  I knew what their position when they sued

15     him was.

16         MR. NEIMAN:  Yeah.  I mean, your Honor, there's a lot

17     of evidence of Michael Ben-Jacob's role in the trial record.

18     His name came up quite a bit.

19         THE COURT:  What's the evidence that he was a

20     tortfeasor as opposed to a paper shuffler?

21         MR. NEIMAN:  I think that if I were wearing SKAT's

22     shoes, I would say there's a lot of evidence that the

23     defendants shared the nature of the trading with Mr. Ben-Jacob,

24     and that their thesis is that anybody who understood the nature

25     of the trading would understand that it was fraudulent.

P24RSKA1

1          THE COURT:  Well, I'm not sure that that is the thesis

2     of their theory.

3          MR. NEIMAN:  Well, certainly not my thesis, but I

4     understand --

5          THE COURT:  No, but it is your burden.  Isn't it?

6          MR. NEIMAN:  Well, it's our burden to show that they

7     have some responsibility to some degree for SKAT's injury,

8     yeah.

9          THE COURT:  Right.  So how about somebody who licked

10    the stamp on the envelope carrying the reclaim?

11         MR. NEIMAN:  Well, I don't think that's the nature of

12    the proof with regard to Mr. Ben-Jacob.  He is the person --

13         THE COURT:  I agree.  He carried it to the post

14    office.

15         MR. NEIMAN:  Your Honor, let me just give you some of

16    the specifics that were established in the trial record.

17         THE COURT:  Gave legal advice on U.S. reporting

18    requirements.

19         MR. NEIMAN:  He drafted the partnership agreements

20    that they claim were all about trying to hide what happened

21    here.

22         THE COURT:  I don't think anybody claimed they were

23    all about trying to hide.  They were about cutting up the

24    money.

25         MR. NEIMAN:  I'll see how it's raised in the closing,

P24RSKA1

1    but I expect that's what they'll argue.

2              THE COURT:  Mr. Weinstein, do you have a position?

3              MR. WEINSTEIN:  Well, with respect to Stein Lhote, I

4    do agree that there's enough in the record.  With respect to

5    Mr. Ben-Jacob, yeah, I think our -- how we might have framed

6    the evidence if he were at trial is quite different than how it

7    actually got framed in this trial.  There is not a lot, I

8    think, with respect to his scienter.  The fact that he as a

9    lawyer drafted partnership agreements or might have signed

10   things doesn't necessarily get to you scienter.  We haven't,

11   for obvious reasons, focused on that or presented it in that

12   way to this jury.  So I haven't gone back and pieced together

13   all the stuff that is in the record on Mr. Ben-Jacob.  But I

14   don't think -- we certainly have not focused on his scienter

15   here.

16             THE COURT:  I'll leave it for now.  We'll see what

17   happens.

18             Okay.  Let's get to the charge.  Anything page 1

19   through page 5, plaintiff?

20             MR. FARRELL:  No, your Honor.

21             THE COURT:  Defendants?

22             MS. WARREN:  No, your Honor.

23             THE COURT:  Page 6 through page 9, line 4?

24             MR. FARRELL:  No, your Honor.

25             MS. WARREN:  No, your Honor.

P24RSKA1

1          THE COURT:  Page 9, line 6, through page 15?

2          MR. FARRELL:  We have one thing, your Honor, in the

3   agency section on page 11, specifically with respect to the

4   description of SKAT's assertions.  We think that there are

5   other agency relationships besides just between the pension

6   plan and the individual defendants that should be listed.

7          THE COURT:  Okay.  Let me get my other glasses.

8          Okay.  Why don't you say it conceptually, and we'll

9   work on the language if it needs to be.

10          MR. FARRELL:  Conceptually, we'd also like to list

11   that Mr. Markowitz and Mr. van Merkensteijn respectively acted

12   as agents on behalf of Mrs. Markowitz and Mrs. van

13   Merkensteijn.  And also, that the authorized representatives,

14   for example, Adam Larosa, also acted as agents on behalf of the

15   individual defendants.

16          THE COURT:  Any objection to listing those as part of

17   SKAT's assertions?

18          MR. BROWN:  Well, your Honor, I think it's a clear

19   statement of the law as it is about agency relationships.  We

20   could include just the statement that, for example, SKAT

21   asserts that the pension plans were agents of the individual

22   defendants without listing every possible agency theory.

23          THE COURT:  All right.  I'll change the word

24   "specifically" to "for example" on line 15, and then after the

25   word "defendants" in line 17, "other examples include

P24RSKA1

```
 1  assertions that Mr. Markowitz and Mr. van Merkensteijn acted as

 2  agents for their respective spouses" and that -- actually, the

 3  word respective doesn't belong there, I think—"spouses and

 4  that the authorized representatives were agents of

 5  Mr. Markowitz and Mr. van Merkensteijn."  Satisfactory?

 6           MR. WEINSTEIN:  Just with the last one, I think when

 7  you said the authorized representatives were agents of I think

 8  you used Mr. and Mr. there?

 9           THE COURT:  Yes.

10           MR. WEINSTEIN:  Just, for example, Mrs. van

11  Merkensteijn testified that she signed a power of attorney for

12  Adam Larosa to act for her plan, so it would be -- I don't

13  think it would be limited to --

14           THE COURT:  Yes, but these are exemplary statements.

15           MR. WEINSTEIN:  Okay.  Yes.  Thank you, your Honor.

16           THE COURT:  Anything else?

17           MR. FARRELL:  Your Honor, at the end of that section,

18  I think the last paragraph also needs to be adjusted similarly,

19  with a sentence that "if you decide that SKAT met its burden."

20           THE COURT:  How do you propose to do it?

21           MR. FARRELL:  We could make it more general and say,

22  "If you decide that SKAT has met its burden of proving that an

23  agency relationship existed and the agent was authorized to

24  submit reclaims to SKAT on behalf of the principal."

25           THE COURT:  Any objection to that from the defense?
```

P24RSKA1

1          MR. BROWN:  No objection.

2          THE COURT:  Okay.  Anything else through page 15?

3          MS. WARREN:  Yes, your Honor.  If we could just move

4   back to page 11, at line 6, I believe there's a typo of "the

5   second defendant" should read "plaintiff."

6          THE COURT:  You're right.  Thank you.

7          MS. WARREN:  And then, if we could go back to page 10,

8   line 1, your Honor?  There's a list of things that are either

9   conceded or undisputed, and one of the things that we think

10  actually is disputed is --

11         THE COURT:  What line, please?

12         MS. WARREN:  I'm sorry.  Page 10, line 1, going into

13  line 2.

14         THE COURT:  Okay.

15         MS. WARREN:  That SKAT sustained damages because of

16  its reliance.  We dispute that.

17         THE COURT:  Do you?

18         MS. WARREN:  We do.

19         THE COURT:  And what's the evidence?

20         MS. WARREN:  The evidence of that, your Honor, is that

21  it is proving damages to SKAT's burden.  We have received

22  stipulations about the amounts that have been received by the

23  defendants.  However, there is also testimony -- excuse me, the

24  defendants' plans.  There's also testimony from Mr. Ekstrand

25  that is undisputed that SKAT could have collected or in fact

P24RSKA1

```
 1    did, and does not know whether or not it did, collect more tax
 2    than it was entitled to.  And if it collected more tax than it
 3    was entitled to, the reclaims that were paid out were not
 4    SKAT's money.  It was the money of whoever it over collected
 5    from.  So therefore, we think that that is something that we
 6    dispute.
 7              THE COURT:  And explain to me how that makes any sense
 8    at all.
 9              MS. WARREN:  Well, yes, your Honor, sometimes --
10              THE COURT:  You're saying, if I understand you
11    correctly --
12              MS. WARREN:  Yes, your Honor.
13              THE COURT:  -- that if SKAT took in, for the sake of
14    argument, $10 million of withholding tax of which $100,000 were
15    an excess payment to SKAT, and it paid out $7 million in
16    reclaims on the basis of false reclaim applications, there was
17    no reliance?
18              MS. WARREN:  No, your Honor.  What we're saying is
19    that not necessarily that there was no reliance.  This goes to
20    whether or not there were damages --
21              THE COURT:  I'm sorry.  You are speaking at warp
22    speed.
23              MS. WARREN:  That is a problem.  I'll slow down.
24              THE COURT:  It's generational.  Don't be personal
25    about it.
```

P24RSKA1

1          MS. WARREN:  What we were saying is this is divorced

2   from the reliance argument.  This actually about whether or not

3   SKAT suffered damages in the first place.  In other words, was

4   the money that it paid out in response to these reclaim

5   applications its money, or was it money that it had wrongfully

6   over collected?  If it wrongfully over collected, then it

7   wasn't its money, and therefore it didn't actually suffer the

8   damages of which it's claiming.

9          THE COURT:  And what's the evidence it wrongfully over

10  collected money?

11         MS. WARREN:  The evidence is from Mr. Ekstrand, and I

12  can refer you to transcript page 361, lines 22, to 363, line 4.

13         THE COURT:  Give me a second.  And please, the line

14  numbers again?

15         MS. WARREN:  361, 22, to 363, line 4, specifically the

16  question and answer:

17  "Q.  And you don't know, sitting here today, whether that

18  happened for any of the companies whose shares are at issue in

19  this case, that happened being the over and under withhold?

20  "A.  No.

21  "Q.  No, you do not know?"

22         THE COURT:  I'm sorry.  I'd be better off reading it.

23  361, line?

24         MS. WARREN:  I'm sorry, your Honor.  22.

25         THE COURT:  Okay.

P24VSKA2

1          THE COURT:  Okay.  I will change this to read --

2          MR. WEINSTEIN:  May I respond, your Honor?

3          THE COURT:  Please.

4          MR. WEINSTEIN:  It's farfetched for several reasons.

5          THE COURT:  You're being so kind.

6          MR. WEINSTEIN:  Yes.  And if your Honor doesn't need

7    to hear it, maybe I should --

8          THE COURT:  No, no.  Go ahead.  Make your record.

9          MR. WEINSTEIN:  First of all, they asked the man a

10   hypothetical that he doesn't know the answer to.

11         THE COURT:  Right.

12         MR. WEINSTEIN:  It's like saying anything is possible.

13         THE COURT:  Yeah.

14         MR. WEINSTEIN:  That's not evidence that it happened.

15         THE COURT:  It's like asking if you had wheels, would

16   you be a bicycle?  Well, I don't know.  Therefore, it's

17   disputed.

18         MR. WEINSTEIN:  Secondly, let's assume it happened.

19   There's no evidence of that, but assume it happened.  The fact

20   that some other entity might have a claim to SKAT that it

21   overpaid has nothing to do with whether these folks took money

22   that they weren't entitled to.  And SKAT is damaged by the fact

23   that it has lost money that was otherwise in its coffers.  The

24   two things really are not related at all.

25         THE COURT:  I'm going to change it to read as follows:

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P24VSKA2

```
1     In this case, all or part of several of these elements are
2     conceded or undisputed.  It is undisputed that the reclaim
3     applications contained material false statements, and that the
4     false statements were made to induce SKAT's reliance on them.
5     There also is no genuine issue of fact that SKAT sustained
6     damages because of its reliance.
7               Is that satisfactory, Mr. Weinstein?
8               MR. WEINSTEIN:  It is, your Honor.
9               THE COURT:  Okay.  Anything else on that section?
10              MR. BROWN:  Yes, your Honor.
11              At the top of page 14, this is the paragraph
12    addressing the alter ego liability theory.  There are two
13    issues.  We submit that this paragraph should be omitted; that
14    the jury instructions are long enough and complicated enough
15    without including the list which is not taken from pattern
16    or --
17              THE COURT:  I applaud your sensitivity to that fact.
18              MR. BROWN:  Yes.  Exactly.  I thought you might be
19    sympathetic to that point, your Honor.
20              These are not factors taken from the pattern jury
21    instructions or precedent jury instructions.  They appear in
22    some piercing-the-corporate-veil cases where courts explain
23    their reasoning.  It's not necessary to give to the jury a list
24    of factors that they may consider, when they have the evidence
25    and they may consider the evidence to consider the two points
```

P24VSKA2

1    important for SKAT to prove an alter ego of liability theory.

2            The second issue I'd raise about these factors are

3    that they really only get to one of those two prongs of alter

4    ego liability.  SKAT must first show that there was domination

5    control; and they must also show that defendant used its

6    domination to commit a fraud or wrong against the plaintiff.

7            And so we have a concern, your Honor, that if the jury

8    heard this long list of factors, and it's the last thing they

9    heard in alter ego liability, that they would have the

10   impression that all they had to find was the domination control

11   aspect and not the second prong that the parties agree is

12   necessary about the defendants using the domination to commit a

13   fraud or wrong.

14           THE COURT:  Overruled.

15           MR. BROWN:  Your Honor, if I may --

16           THE COURT:  No, you may not.

17           MR. BROWN:  Okay.

18           THE COURT:  I think the ruling was clear.

19           Do you not understand what "overruled" means?

20           MR. BROWN:  I just meant I could suggest a small tweak

21   to the language besides deleting the paragraph entirely.

22           THE COURT:  Maybe you should have started with that.

23           MR. BROWN:  That's what we meant to present in

24   suggesting there are two issues.

25           On the second one, your Honor could simply add some

P24VSKA2

1    language regarding this list of factors that in deciding

2    whether SKAT has met its burden of proof regarding domination

3    control, you may consider these factors.  We would just suggest

4    adding that phrase regarding on domination and control.

5              THE COURT:  I'll be happy to do that.

6              Anything else on that section up to page -- to and

7    including page 15?

8              Okay.  Page 16 through page 19.

9              Plaintiff?

10             MR. FARRELL:  Nothing, your Honor.

11             THE COURT:  Defense.

12             That's 19, line 11.  Hearing none --

13             MS. WARREN:  Sorry, your Honor.  This might be a good

14   time to raise it.

15             We had previously proposed in the draft jury

16   instructions that were submitted to the Court a good-faith

17   instruction.  And we would just propose we would like to ask

18   the Court again to add that to the proposed charge.

19             THE COURT:  To add what exactly?

20             MS. WARREN:  A good-faith instruction, your Honor.

21             THE COURT:  Anything in particular?

22             MS. WARREN:  Yes, your Honor.  Give me one moment.  I

23   will pull up the language that we had previously proposed.

24             The language is -- this was subpart 11, this was on

25   page 27 of 92 of docket 1246.  As I just --

P24VSKA2

| | |
|---|---|
| 1 | THE COURT: I'm sorry, of docket what? |
| 2 | MS. WARREN: 1246, your Honor. |
| 3 | THE COURT: Page 27. Oh, I see, you're using the ECF |
| 4 | numbers. |
| 5 | MS. WARREN: Yes, your Honor. |
| 6 | THE COURT: Instead of the page numbers. Okay. |
| 7 | The proposed instruction, in my view, is not a fully |
| 8 | accurate or appropriate instruction and I will not adopt it. |
| 9 | MS. WARREN: Understood, your Honor. |
| 10 | MR. DULBERG: Your Honor, if we're still on page 17 of |
| 11 | Court Exhibit 2 -- |
| 12 | THE COURT: Yes? |
| 13 | MR. DULBERG: At the very end, if the jury were to |
| 14 | find yes as to none or, as I would put it, no, as to both |
| 15 | questions 2(a) and 2(b) on the verdict form, we don't think |
| 16 | they would continue on to question 3. |
| 17 | THE COURT: You may be right. Let me focus on that |
| 18 | for a minute. I think you are right. No? I'm getting the |
| 19 | high sign from my law clerk. |
| 20 | The knowledge, which is the subject of question 3, is |
| 21 | asked not only for purposes of individual liability, but for |
| 22 | purposes of imputation to the plans. And notwithstanding my |
| 23 | comment a moment ago, we intend to have the jury go on to |
| 24 | question 3. |
| 25 | Okay. Anything else through, I think it was, page 19, |

P24VSKA2

1    line 11?

2              MR. DULBERG:  There's a very minor typo on page 18.

3              THE COURT:  Page?

4              MR. DULBERG:  18, line 17.

5              THE COURT:  The misspelling of the word "that."

6              MR. DULBERG:  Correct.

7              THE COURT:  Thank you.

8         Okay.  Page 19, line 13 through page 22, line 10.

9              MR. FARRELL:  Nothing from plaintiff.

10             THE COURT:  Defense?

11             MS. WARREN:  Yes, your Honor.

12        One thing on page 21, line 15.  The line "by virtue of

13   failing to act when required to do so enables the fraud to

14   proceed."  We don't believe that there's been any evidence

15   introduced that we had a duty, that defendants had a duty that

16   would contemplate use of this omission-type language and,

17   therefore, we would object to it.

18             THE COURT:  Mr. Weinstein?

19             MR. FARRELL:  No objection to that, your Honor.

20             THE COURT:  Okay.  We'll delete that.

21             MS. WARREN:  And on page 22, your Honor, lines 1

22   through -- it might be through to the end, through 1 through 6,

23   it looks like this might be the conscious avoidance instruction

24   again.

25             THE COURT:  Yes.

P24VSKA2

1          MS. WARREN:  Yes.  As opposed to the substantial

2     assistance instruction.

3          THE COURT:  What's your point?

4          MS. WARREN:  I think that this should be -- question 5

5     is about substantial assistance, and so it just looks like here

6     it might have repeated language from a prior instruction.

7          THE COURT:  I see.  I see.

8          MS. WARREN:  Yes, your Honor.

9          THE COURT:  I'll consider that.  I'll take a look at

10     it later on.  But worst case is it's a repetition.

11          MS. WARREN:  Yes, your Honor.

12          THE COURT:  Okay.  Page 22, line 12 to page 23, line

13     13.  Anything from the plaintiff?

14          MR. FARRELL:  No, your Honor.

15          THE COURT:  Defense?

16          MS. WARREN:  Yes, your Honor.

17          There line 19 through line 1 on the following page, so

18     22, line 19, to 23, line 1, there are several items here that

19     we believe are disputed.  And that would be item 1, 2, 4, and

20     5.  The line on page 23 just says most of these requirements

21     are conceded or present no general -- genuine issue of fact.

22     And we would just recommend changing the word -- or propose

23     changing the word "conceded" to "addressed elsewhere in the

24     verdict form."

25          THE COURT:  Okay.  Page 23, line 15 through page 26,

P24VSKA2

 1    line 12.

 2                MR. FARRELL:  Nothing, your Honor.

 3                MR. DAVIDSON:  Your Honor, this is Dan Davidson for

 4    the van Merkensteijn defendants.

 5                On page 24, lines 14 and 15, defendants wanted to

 6    raise an issue with -- in that sentence.  The phrase "defendant

 7    was unjustly enriched by at least the value," it's the words

 8    "at least."  We don't believe that the record supports an

 9    argument that the defendants were enriched more than the value

10    of the refund claims.  So we view that the phrase "at least" as

11    confusing to the jury and ask that it be removed.

12                THE COURT:  That sounds right.

13                Mr. Weinstein?  I spoke too quickly, I think.

14                MR. FARRELL:  I think, your Honor, that was intended

15    to capture amounts received to the partnerships.

16                THE COURT:  Of the partnerships, yes.

17                I think that's a valid point by the plaintiff.

18                Is there some different language you'd prefer?

19                MR. DAVIDSON:  Sorry.  One moment, your Honor.  I'm

20    just trying to understand.

21                We understand the plaintiff's point, your Honor, so

22    that's fine with us.

23                THE COURT:  Okay.  Anything else on that section?

24                MS. WARREN:  Yes.  One minor suggestion for line 5 on

25    page 24.  There is a -- you have the words "you may consider

P24VSKA2

1    whether SKAT paid the refund claims under a mistake of fact or

2    law," and then it continues.  So we would just recommend adding

3    "you may consider, among other things," so that the paragraph

4    starting at line 9 to 15, so that it's not in conflict with

5    that paragraph.

6              THE COURT:  I'll do that.  Thank you.

7              Page 25, line 5, or I think I said up to 26, line 12

8    before.  So I think we've covered this section.

9              Anything on the section headed Sections 2, 3, and 4?

10             MR. FARRELL:  No, your Honor.

11             THE COURT:  Page 27 through page 29, line 16.

12             MR. FARRELL:  Nothing for plaintiff.

13             MS. WARREN:  Just one minor thing on page 28, line 7.

14   The line that begins:  "That means when SKAT had sufficient

15   information."  We would suggest it read:  "That means when SKAT

16   had or should have had sufficient information."

17             THE COURT:  Plaintiff?

18             MR. FARRELL:  We have no objection to that, your

19   Honor.

20             THE COURT:  I agree.  I'll make that change.

21             Anything on the comparative fault section?

22             MR. BROWN:  Your Honor, just backing up.  I'm sure

23   you're on top of this, but if we're adding an unjust enrichment

24   statute of limitations question to the verdict form, depending

25   on the numbering, it might change the reference on page 29.

P24VSKA2

```
 1    I'm sorry, your Honor, I think you suggested doing it as a
 2    question part A and part B., in which case --
 3               THE COURT:  I'm lost in the alphabet soup.
 4               MR. BROWN:  Yes.  On page 29, lines 8 and 9, it's
 5    referring to the statute of limitations question on the verdict
 6    form.
 7               THE COURT:  I see.
 8               MR. BROWN:  And it's possible that that number
 9    could --
10               THE COURT:  Cross-reference.  I've just made a note to
11    check the cross-reference.  Okay.
12               MR. DULBERG:  While we're in that territory, your
13    Honor, we think on page 29, lines 11 to 12, if they answer no
14    to those four questions, they'd be skipping questions 39, 40
15    and 41.
16               THE COURT:  Does everybody agree on that or not?
17               MR. DULBERG:  And if they are not skipping question
18    42, they shouldn't notify the officer that they had reached a
19    verdict quite yet.
20               MR. WEINSTEIN:  Sorry.  We're trying to piece that
21    together, your Honor.
22               MR. FARRELL:  We agree, your Honor.
23               THE COURT:  Okay.  So we're checking the
24    cross-references and checking on the officer reaching a
25    verdict.  Fine.
```

P24VSKA2

|    |    |
|----|----|
| 1  | MR. DULBERG:  We also had a very minor concern on line |
| 2  | 10, page 29, that jurors may, depending on how they read this |
| 3  | or hear it, they may think that if they answer yes to the |
| 4  | questions at the start of that sentence, they skip to question |
| 5  | 39. |
| 6  | And so our suggestion would be to just flip that |
| 7  | sentence.  So with respect to question 39, if you answered yes |
| 8  | to 6, 15, 24 or 33, as drafted, it could lead them to think |
| 9  | they skipped from 6, 15, 24 or 33 straight to 39. |
| 10 | THE COURT:  So you would have it say, with respect to |
| 11 | question 39:  If you answered yes to questions 6, 15, 24 or 33, |
| 12 | then what? |
| 13 | MR. DULBERG:  Then consider question 39. |
| 14 | THE COURT:  So it's got question 39 both at the |
| 15 | beginning and the end of the sentence. |
| 16 | MR. NEIMAN:  Your Honor, one suggestion to eliminate |
| 17 | that in this very delicate drafting issue here.  If it said |
| 18 | turning to question 39, if you answer no to questions 6, 15, 24 |
| 19 | and 33, then skip questions 39, 40, and 41. |
| 20 | THE COURT:  We'll figure it out. |
| 21 | 29, line 18 through 32, line 2. |
| 22 | MR. FARRELL:  Nothing for plaintiff, your Honor. |
| 23 | THE COURT:  I couldn't hear you. |
| 24 | MR. FARRELL:  I said nothing for plaintiff, your |
| 25 | Honor. |

P24VSKA2

 1            THE COURT:  Defense?

 2            MS. WARREN:  Yes, your Honor.

 3            On page 31, lines 12 and 13, there's a line that

 4     reads:  Apportionment of fault does not apply to SKAT's claims

 5     for fraud, aiding and abetting and unjust enrichment.

 6            We would just -- we think that this line is redundant

 7     in light of the previous line which is:  You are to apportion

 8     fault only in connection with SKAT's negligent

 9     misrepresentation claims.

10            THE COURT:  I'm going to leave it alone.

11            MS. WARREN:  Yes, your Honor.

12            THE COURT:  32, line 4 to the end.

13            MR. FARRELL:  Nothing for plaintiff, your Honor.

14            MR. WEINSTEIN:  Was it to the end?

15            Just on the expert witnesses on page 37, in line 2,

16     there's been two witnesses rather than three.

17            And on line 13 --

18            THE COURT:  It reminds me of the wonderful old

19     Dodger/New York Giants joke.  Double header, Fenway Park,

20     Willie Mays has destroyed the Dodgers at both ends.  And

21     finally, the Dodgers losing a second game too late in the

22     inning, there's a guy on third and two outs, and a fly ball has

23     hit to deep center.  And Willie Mays goes back and makes a

24     perfect throw on.  And the Dodger manager turns to the bench

25     coach and says, Finally found his weakness.  He can't count.

P24VSKA2

1          The baseball fans will explain it to you to those of

2      you who don't follow the sport.

3          Anything else?

4          MR. WEINSTEIN:  Line 13 refers to "she."

5          THE COURT:  On which page?

6          MR. WEINSTEIN:  On the same page, page 37, line 13.

7      Just because they were both males.

8          THE COURT:  Okay.  Got it.

9          There's no more federal money for correcting that.

10          MR. WEINSTEIN:  And then on page 38, at the very top,

11      with respect to hearing testimony from SKAT's sued folks who

12      are not defendants in this trial.

13          THE COURT:  That is certainly true.

14          MR. WEINSTEIN:  I think probably Robert Klugman should

15      be included there.

16          MR. DULBERG:  Hold on.  We didn't hear testimony from

17      Mr. Klugman.  We think there is an issue with that sentence,

18      but that's not it.

19          THE COURT:  That's not it.  They haven't heard

20      testimony from Shah.  That's our mistake.

21          MR. WEINSTEIN:  I'm sorry.  I misread the sentence,

22      your Honor.

23          THE COURT:  And they didn't hear testimony from

24      Ben-Jacob, as I remember, right?

25          MR. DULBERG:  Correct.

P24VSKA2

1    And, your Honor, they did hear testimony from Robin

2    Jones, whose name should be added to that list.

3    THE COURT:  Good catch.  Thank you.

4    MR. WEINSTEIN:  I'm sorry.  I thought the concept I

5    misread, that it was about --

6    THE COURT:  What's happened here is that there are two

7    concepts involved.  And I need to elaborate slightly.

8    The phrase in the following sentence:  The reasons

9    that these individuals and others who may have been mentioned

10    who did not testify.  Satisfactory all around?

11    MR. WEINSTEIN:  Yes, that covers the concern I was

12    getting at.  Thank you.

13    THE COURT:  Okay.  Anything else?

14    MR. DULBERG:  Yes, your Honor.  Two very minor things.

15    Going back to page 32, line 6.  It refers to question

16    43.  But at least the version that we have, the last question

17    is 42.

18    THE COURT:  Okay.  I'll fix that.

19    MR. DULBERG:  And then in the consideration of

20    evidence discussion, you discuss charts and summaries.

21    THE COURT:  What page are you on?

22    MR. DULBERG:  I'm sorry.  Page 34, lines 19 and 20

23    begins a discussion of charts and summaries.

24    THE COURT:  Yup.

25    MR. DULBERG:  We would suggest adding a very short

P24VSKA2

1   discussion of slides or demonstratives so that the jury

2   understands that what they saw on a screen which was presented

3   as a slide, but has not been admitted as evidence, is not an

4   exhibit and is not evidence.

5          THE COURT:  I framed this the way I did because there

6   is an instruction here that they are to consider only exhibits

7   that were admitted into evidence and pointed out specifically

8   that anything that was marked for identification is not

9   evidence.

10          I'm afraid if we make a modification such as you

11   suggest, we are going to suggest that anything they saw on the

12   screen is not evidence, which is not -- we can't do that.  And

13   I don't think the jury knows what the phrases or the words

14   "demonstrative" or "slides" in this context means.

15          I'm certainly open to in some way clarifying that

16   certain materials that were used, certain graphic materials

17   that were used to illustrate testimony or arguments were not

18   received in evidence and will not be in the jury room.

19          MR. DULBERG:  That's exactly right, your Honor.

20          THE COURT:  Right.

21          So, Amy, please make a note that we should do that.

22          But anything else?

23          MR. BROWN:  One small thing, your Honor.  It's the

24   cross-reference point again.  Mr. Dulberg pointed out the

25   question 42 number that's on page 32 of the instructions.

P24VSKA2

```
 1              THE COURT:  Right.

 2              MR. BROWN:  We discussed making some changes to

 3    question 42 and initially made here as well.

 4              THE COURT:  And you're referring on page 32.

 5              Yes.  And I already have a circle around question 43

 6    because someone else raised it.

 7              Okay.  Anything else?

 8              MR. NEIMAN:  Just so that that's clear, your Honor, I

 9    think the point that Mr. Brown was making is because we've

10    changed the verdict form on this question, that that change in

11    the verdict form will need to be carried over to this

12    instruction.

13              THE COURT:  Of course.  Of course.

14              MR. NEIMAN:  Okay.

15              THE COURT:  All right.  Good work.

16              Closings.  How long?  Plaintiff opens and rebuts.

17              MR. WEINSTEIN:  Yes.  Your Honor, the range at the

18    moment I would say for opening --

19              THE COURT:  For opening your closing.

20              MR. WEINSTEIN:  Would be an hour and 45 to two.

21              THE COURT:  Defense?

22              MS. McCARTHY:  Your Honor, I'll be going first.  We're

23    flipping the order.  And I am trying to get it under two, but

24    right now I'm at two.

25              MR. NEIMAN:  And, your Honor, I'm trying to get it
```

P24VSKA2

```
 1    shorter also, but right now around two as well.
 2              THE COURT:  So it looks to me like we're going to
 3    get -- we might finish the principal closings and go over a day
 4    to rebuttal.  That's the way it looks like it works.
 5              MR. NEIMAN:  Your Honor, we would ask that we try to
 6    figure out a way to do this all in one day.
 7              THE COURT:  Well, the answer is everybody needs to
 8    shorten up some.  I have no control over that.  We're starting
 9    at 9:30.  We'll take an hour for lunch.  We'll lose a half hour
10    to breaks.  If we go to 4:30, that's six hours, five and a half
11    hours.  I can't manufacture time.
12              MR. NEIMAN:  No, that's hard to arrange.
13              I guess what we would suggest, your Honor is -- one
14    possibility is for the parties to agree that all the summations
15    be completed within that time.  We can certainly talk to
16    Mr. Weinstein about that.  And the other option would be to go
17    a little later.
18              THE COURT:  We're talking about going till 6 o'clock
19    or later then.
20              MR. NEIMAN:  I wouldn't suggest we go past 6, your
21    Honor.  But if we went to 6, I think we probably could all find
22    a way to allocate time to make it work.
23              THE COURT:  I'll think about it.  You see what you can
24    work out among yourselves.  And I may see what the jury wants
25    to do also.  I'm likely to do that.
```

P24VSKA2

1              So you have to be ready to go either way.

2              MR. NEIMAN:  Sure.

3              THE COURT:  Okay.  I think that takes care of it.

4              And I thank you.  And obviously it's been a tiring

5    trial for everybody, you more than I.  And we'll take it from

6    there.  Good night.

7              MR. NEIMAN:  Thank you, your Honor.

8              (Adjourned to February 5, 2025, at 9:30 a.m.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25